SO ORDERED: February 25, 2014.



_____
**Robyn L. Moberly
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SALLY BAKER SMITH | ) | CASE NO. 13-6765-RLM-7 |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| PATRICIA SMITH | ) | Adversary Proceeding |
| | ) | No. 13-50167 |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| SALLY BAKER SMITH | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the Court for trial commencing on January 27, 2014 and resuming and concluding on February 14, 2014 upon the Plaintiff's *Complaint to Determine Dischargeability of Indebtedness* filed on July 17, 2013. The Court heard the

1

testimony of the witnesses, the arguments of counsel and now makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### *Findings of Fact*

1. Sometime in 1992 or 1993, the Plaintiff, Patricia Smith (the "Plaintiff") and her husband, Dale ("Dale") borrowed money and built a four- bedroom, three-bath home with a three car garage in Brookville, Indiana (the "Residence") on property they owned as tenants by the entireties. The Residence was next door from where Patricia and Dale lived.

2. It was understood that the Plaintiff's son, Jeff, ("Jeff") and his then-spouse Sally, the Defendant (the "Defendant"), would move into the Residence, by either buying the Residence from the Plaintiff and Dale or by assuming their mortgage payments. Jeff and the Defendant have three children.

3. Jeff and the Defendant divorced in 1996. The Defendant moved out of the Residence for a period of time but moved back into the Residence by late 1996, with the children but without Jeff. Dale and the Defendant verbally agreed that the Defendant would pay a monthly rent of $285 to continue living in the Residence as well as maintain the insurance on the Residence, which the Defendant did until Dale's death. The Defendant ceased paying the monthly rent payments after May, 1999. The Defendant did not advise Plaintiff that Defendant would no longer be making monthly payments.

4. The Plaintiff and Dale paid their mortgage payments and property taxes on the Residence and, after Dale's death, the Plaintiff made the remaining mortgage

payments until it was paid in full sometime in 2002. Plaintiff also continued paying the property taxes.

5. The Defendant dealt exclusively with Dale when it came to making repairs to the Residence. The Defendant did not call the Plaintiff to make any repairs, and the Plaintiff did not offer to make any repairs to the Residence after Dale's death in April, 1999. Despite their family connections and the close proximity in which they lived, the Plaintiff and the Defendant had little to do with each other, and the Plaintiff visited the Residence infrequently. As of the trial held in early 2014, the Plaintiff testified the last time she was in the Residence was in June, 2011 for a graduation party for her granddaughter. The Plaintiff's daughter, Jennifer, (the Defendant's ex-sister-in-law) was also at the graduation party. Neither the Plaintiff nor Jennifer noticed any remarkable damage to the Residence at that time, but their visit was confined primarily to the garage and the back patio.

6. Jennifer visited the Residence two more times in July, 2011, the second time to "confront" the Defendant about certain allegedly illegal or immoral acts occurring at the Residence, none of which are relevant here. Although Jennifer was inside the Residence on her first visit, her second visit was confined to the outside deck or porch. During the second visit, Jennifer told the Defendant that she needed to start paying rent to the Plaintiff. The Defendant, who had not paid rent to live in the Residence since May, 1999, did not commence rent payments to the Plaintiff.

7. On July 22, 2011, the Plaintiff caused the Franklin County deputy sheriff to serve the Defendant at the Residence with a "Notice to Quit", giving the Defendant notice that her "tenancy of the premises is terminated", that the Defendant had

3

ten (10) days upon receipt of the notice to surrender possession of the Residence, and that her failure to do so would result in judicial eviction proceedings. The Defendant claims the first time she saw this notice was at the trial in this adversary proceeding.

8. The Defendant did not surrender possession of the Residence, and the Plaintiff filed an eviction action on August 8, 2011. On September 6, 2011, the Franklin County Circuit Court ordered that the Defendant wrongfully possessed the Residence and that the Plaintiff would be entitled to possession at noon on October 1, 2011. The Defendant vacated the premises on October 1, 2011 at noon, as ordered. The State Court also scheduled a damages hearing for October 10, 2011.

9. The Plaintiff, with a deputy sheriff, entered the Residence within hours after the Defendant's departure on October 1st and found large amounts of garbage, three (3) garage doors damaged, a dented steel entry door with a damaged frame, a broken interior bi-fold door, kitchen cabinet doors and drawers missing, six (6) interior door panels missing with broken locks, insulation ripped from some walls, holes in interior walls, derogatory remarks directed at the Plaintiff written on chalkboard paint in a bedroom, a missing stairway bannister, carpet that was saturated with animal urine and feces, damage to half of the electric sockets, damaged soffits and rotted food in a freezer that had been unplugged. They also found sexually provocative photographs in one of the bedrooms which purposely were left in plain view so as to be found.

10. As a result of the damages hearing held on October 10th, the Plaintiff obtained a judgment against the Defendant on July 30, 2012 in the amount of $11,240 (which coincided with one of the two repair estimates obtained by the Plaintiff) plus $500 in attorney fees and costs (the "State Court Judgment").  The State Court concluded that the Defendant failed in her statutory duties to care for and maintain the Residence and to deliver it in a clean and proper condition, excepting ordinary wear and tear.  The State Court Judgment made no mention that any of the Defendant's acts that led to the breach of her duties were intentional , willful, or malicious and did not award punitive damages.
11. The Plaintiff contends that the State Court Judgment is a debt that arises from the Defendant's willful and malicious injury to the Plaintiff's property and is nondischargeable under 11 U.S.C. §523(a)(6).

### *Conclusions of Law*

1. Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992).  A creditor who brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991).
2.  A debt is excepted from discharge under Section 523(a)(6) if the debt is for "willful or malicious injury by the debtor to another entity or to the property of another entity".

5

3. With respect to the "willful" requirement, it is not enough for a debtor to commit an intentional act that leads to injury, the injury itself must be deliberate or intentional for a debt to be excepted from discharge under this section. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed. 2d 90 (1998); *First Weber Group, Inc v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013).

4. Maliciousness has been more difficult to define. Generally, it requires a debtor to act "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill will or specific intent to do harm. *Id.*; *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994).

5. Definitions of "willful" and "malicious" for §523(a)(6) purposes abound in case law. As the Seventh Circuit acknowledged, "in the course of our research we have discovered to our surprise that courts are all over the lot in defining this phrase in section 523(a)(6)". *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 323 (7th Cir. 2012). The Seventh Circuit, canvassing the various circuits and their own takes on "willful" and "malicious", concluded that, "...whatever the semantic confusion, we imagine that all courts would agree that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury, or knowing it was highly likely to result from his act". *Jendusa-Nicolai*, 677 F.3d at 324.

6. The Plaintiff has argued that the State Court Judgment has a preclusive effect on the issue of willfulness and deliberateness. Issue preclusion applies only to matters actually litigated and decided, not all matters that could have been

6

decided. *Kirby v. Second Bible Missionary Church*, 413 N.E.2d 330, 332 (Ind.Ct.App.1980), *Miller Brewing Co. v. Indiana Dep't of State Revenue,* 903 N.E.2d 64, 68 (Ind. 2009).   Issue preclusion prevents the relitigation of an issue previously decided in a judicial proceeding as long as the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding. *Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S.Ct. 411, 414–415, 66 L.Ed.2d 308 (1980).

7. The first prong requires that the issue—willful and malicious injury to the property of another—was actually litigated and determined by the State Court and whether the determination was essential to the judgment.

8. The State Court found that the Defendant breached her statutory duties to care for and maintain the Residence and to deliver it in a clean and proper condition, excepting ordinary wear and tear.  The Plaintiff attempts to elevate the breach of this statutory duty into acts that make the debt nondischargeable under §523(a)(6).  The *Geiger* Court noted that to give the "willful and malicious" standard a broader interpretation would be to except from discharge injuries derived from "[e]very traffic accident stemming from an initial intentional act" and every "knowing breach of contract." Id. at 62, 118 S.Ct. at 977. The Court stated that such a broad interpretation would be in conflict with the policy that "exceptions to discharge 'should be confined to those plainly expressed.' " Id. (quoting *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 49 L.Ed. 717 (1915)).

7

9. The Plaintiff contends that the Defendant damaged the Residence in retaliation for being forced to leave and that the derogatory message on the chalkboard and the provocative pictures in plain view in the bedroom were some of the factors that show the damage was intentional.

10. The Defendant teaches fifth grade, holds down another part time job and has been a single mother to three children.  The Defendant testified that the condition of the Residence when she left it on October 1st was "not that bad". The Residence was a four bedroom , three bath house and by the time the Defendant found suitable and much smaller alternate housing, there wasn't enough room for all of the family belongings.  Defendant dedicated 30 straight hours to moving but she did not have time to clean the Residence because of the strict deadline by which she had to vacate the premises.  There was conflicting evidence whether Defendant and her two daughters would have been permitted to exceed the time at which she was ordered to be out of the Residence, but the Defendant did not believe she would be afforded more time if she asked.  The Defendant reasonably believed neither she nor at least her two daughters were allowed to go back into the Residence to finish removing personal items before the expiration of the deadline.

11. Defendant maintained that the only repairs that had been made to the Residence since Dale's death had been made by her or by Jeff and that the condition in which the Residence was left was the culmination of years of living with active children and pets.  The missing bannister was intentionally removed years prior to Defendant's move and the bannister remained stored in the

basement beneath the stairs. The storm door had been poorly installed by Jeff years prior. The damage to interior doors occurred long before Defendant's move but was hidden by posters on the doors. Even Plaintiff acknowledged that at least some of the condition of the house was attributable to Defendant's lax parenting of the teenagers living in the house (who were Plaintiff's grandchildren and Defendant's children). The Residence was in substantially the same condition when Defendant moved out, with the exception of significant filth and some personalty, as it had been for her daughter's graduation party in June, 2011. The garage doors were dented when Dale backed his vehicle into them sometime around 1999. Defendant's son, Adam, had "anger management issues" and had punched holes in the drywall with his fists, many of which had been patched but were not re-painted. Jeff damaged the front door in approximately 2004 when he carelessly removed a metal file cabinet from the house. Jeff was the last person to leave the Residence on October 1st before the Plaintiff came over to inspect and it was he who left the derogatory message on the chalkboard wall, not Defendant. There was no evidence Defendant encouraged or sought Jeff's damage to the door or the derogatory writings.

12. The Plaintiff accurately points out that an injury can be "malicious" if it is the result of a "conscious disregard" of one's duties, or without just cause or excuse and that it does not require ill will or specific intent to do harm. That may be true, but for the Defendant to have consciously disregarded her duty, she would have needed to have known of her duty in the first place. In addition, the Plaintiff would have needed to have proven by a preponderance of the evidence that the

Defendant had no just cause or excuse to have allowed the damage to occur and the Court concludes that the Plaintiff has not carried that burden. There was insufficient evidence to conclude that the Defendant's motive in leaving the house in such poor condition was to inflict injury. The mere failure to supervise or oversee her children in their treatment of the Residence does not rise to the level of nondischargeability under §523(a)(6). The family issues and behavioral issues with the Defendant's son compounded the problem. Granted, the Residence, from the photographs admitted into evidence, appeared to be left in a deplorable mess, but it was not because the Defendant intended to leave it that way after she was evicted; it was the product of years of failure to maintain the residence, supervise her children, unclean habits, and a rush to remove belongings.

13. The Plaintiff has not shown by a preponderance of the evidence that the Defendant inflicted the damage to the Residence knowing she had no "legal justification" or knowing that the injury was highly likely to result from her acts. Accordingly, the Court concludes that the debt is DISCHARGEABLE under §523(a)(6). Judgment will be entered separately in favor of the Defendant.

# # #

Distribution:

Richard Wayne Greeson, Attorney for the Plaintiff
Warren Nerz, Attorney for the Defendant